
FILED
2011 Jun-03  AM 09:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHELLE JONES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:09-cv-00823-AKK** |
| **THE STATE OF ALABAMA** | ) | |
| **DEPARTMENT OF HUMAN** | ) | |
| **RESOURCES,** *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Michelle Jones ("plaintiff"), a former employee of the Jefferson County Department of Human Resources ("Jeff Co DHR"), filed this action against Jeff Co DHR, the State of Alabama Department of Human Resources ("State DHR"), Nancy T. Buckner, Barbara Givins, Desiree Jackson, Kim Mashego, Patricia Muscolino, Amanda Rice, Angela Turner, and Page Walley.  Doc. 1.  She alleges discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; Section 1981 and 1983, 42 U.S.C. §§ 1981 and 1983; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* Doc. 36.

Angela Turner moved independently for summary judgment on September

29, 2010, doc. 51, and the remaining defendants filed their motion on October 4,

2010, doc. 56.  Plaintiff also moved for summary judgment.  Doc. 60.  On

November 18, 2010, defendants moved to strike some of the evidentiary materials

plaintiff submitted in support of her motion, doc. 73, and, on November 23, 2010,

plaintiff moved for leave to file those materials, doc. 74.  The court makes an

exception to the submission schedule to ensure that it has all of plaintiff's

evidence in considering the summary-judgment motions.  Accordingly,

defendants' motion to strike, doc. 73, is DENIED, and plaintiff's motion for leave,

doc. 74, is GRANTED.  Further, for the reasons set forth below, defendants'

motions for summary judgment, docs. 51 and 56, are GRANTED on all claims,

except the Title VII race-discrimination claim against Jeff Co DHR, and plaintiff's

motion for summary judgment, doc. 60, is DENIED.

## I.  SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56©, summary judgment is proper

"if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  "Rule 56© mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Id*. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (*per curiam*) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

The existence of cross-motions for summary judgment does not affect the applicable Rule 56 standard. *See U.S. Aviation Underwriters, Inc. v. Yellow Freight Sys., Inc.*, 296 F. Supp. 2d 1322, 1330 (S.D. Ala. 2003) (citing *Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir.

2001)).  The court considers each motion separately and need not necessarily grant

one or the other.  *Id.*  The existence of cross-motions, however, may indicate a

belief of the parties that there is agreement on the material facts.  *Id.*

## II.  FACTUAL BACKGROUND[1]

Plaintiff, who is African American, worked as a social worker at Jeff Co

DHR from December 1995 until September 2008.  Doc. 36 ¶ 6.  She asserts that

she suffers from "epilepsy and back and neck problems," and that defendants

discriminated against her due to her race, sex, medical conditions, and FMLA

status from September 2007 until her alleged constructive discharge on September

5, 2008.  *Id.* at ¶¶ 20-27.

### A.    *Plaintiff's Employment at Jeff Co DHR*

At all times relevant to this matter, plaintiff worked in Jeff Co DHR's

daycare-licensing unit, doc. 52-3, plaintiff dep., at 56:14 and 62:2, inspecting and

licensing daycares that operated from individuals' homes, doc. 52-1, Turner Aff.,

at 3-4.  Four other individuals held the same position:  Laura Baxley ("Baxley"), a

Caucasian female; Junakee Gaines ("Gaines") and Ernestine Key ("Key"),

African-American females; and Ronald Henderson ("Henderson"), an African-

American male.  Doc. 52-3, Plaintiff Dep., at 90:1-7; Doc. 52-1, Turner Aff., at 3.

---

[1]The facts are presented in the light most favorable to plaintiff.

4

Plaintiff reported to Turner, the Supervisor of the unit, doc. 52-1, Turner Aff., at 2, who in turn reported to Barbara Givins ("Givins"), the Program Manager for Daycare Licensing and Adult Services, doc. 57-3, Givins Aff., at 2. Givins reported to Kim Mashego ("Mashego"), the Assistant Director of Child Welfare. Doc. 57-2, Mashego Aff., at 1-2. Mashego reported to Patricia Muscolino ("Muscolino"), the Interim Director from December 2005 until October 1, 2008 or November 2008, when Amanda Rice ("Rice") succeeded her.[2] Doc. 57-1, Muscolino Aff., at 2; Doc. 57-4, Rice Aff., at 1. In addition to these individuals, plaintiff has sued Page Walley ("Walley"), the State DHR Commissioner from January 1, 2003 until September 1, 2008, doc. 57-6, Walley Aff., at 1, Nancy T. Buckner ("Buckner"), Walley's successor, doc. 57-5, Buckner Aff., at 1, and Desiree Jackson ("Jackson"), the Director of State DHR's Office of Civil Rights/Equal Employment ("CR/EE"), doc. 57-7, Jackson Aff., at 1.

1.    *On-call Requirement*

Jeff Co DHR facilitates foster-care placements and investigates reports of child abuse and neglect. Doc. 57-2, Mashego Aff., at 2. These duties require immediate response 24-hours a day and often involve workers transporting children from troubled situations to foster homes. Doc. 57-1, Muscolino Aff., at 9.

---

[2]The affidavits of Muscolino and Rice conflict as to when Rice succeeded Muscolino.

In late 2006, to spread the after-hours burden, Jeff Co DHR added the daycare-licensing and child-welfare workers to a rotating schedule in which they worked on-call for a 24-hour period during a weekend or holiday "a few times a year."[3] *Id.* at 11; Doc. 57-2, Mashego Aff., at 3; Doc. 53-1 at 7-8.  Jeff Co DHR contends that it classified on-call duties as an "essential function" as early as September 2006. Doc. 57-1, Muscolino Aff., at 11.  However, it only expressly added the on-call duties to the workers' Performance Appraisal responsibilities on February 8, 2008. Doc. 57-2, Mashego Aff., at 3.

### 2.   *Plaintiff's FMLA and Accommodation Requests*

Plaintiff requested and received intermittent FMLA leave for physical therapy and treatment for pain along her spine effective May 9, 2007, through May 9, 2008.  Doc. 54-8, FMLA documents, at 942, 944.  Thereafter, she extended the intermittent FMLA leave for another year, through May 12, 2009.  Doc. 57-11, Exs. to Coley Aff., at 21.  She also submitted four accommodation requests for defendants to limit her home visits to one daily and to excuse her from the on-call rotation in 2007 and 2008, each of which defendants denied.[4]  Doc. 57-7, Jackson

---

[3]"Prior to the year 2000," the "Night Unit" handled the on-call duties.  Doc. 52-1, Turner Aff., at 7.  The record is unclear as to who handled the duties between 2000 and 2006.

[4]State DHR policies require CR/EE to review all accommodation requests and to submit a recommendation to the Commissioner.  Doc. 57-7, Jackson Aff., at 2.  Walley served as Commissioner at all relevant times.

Aff., at 2.

a.    *First request for accommodation*

Plaintiff submitted her first accommodation request on July 30, 2007, due to "stiffness and persistent muscle aches in [her] neck, along [her] spine, shoulders, back tailbone, buttocks, legs and feet . . . [that] is aggravated by constant movements and prolonged periods of sitting, standing, and bending." Doc. 57-7, Exs. to Jackson Aff., at 12.  Plaintiff asked for Jeff Co DHR to limit her to "one home visit in an eight hour shift." *Id*.  As justification, she stated:

> I had attempted to make more than one home visit in an eight hour
> shift, I was overcome by a tremendous amount of pain.  As a result,
> per doctor's order dated May 23rd, I have been restricted in my visits.
> I take muscle relaxants in the evenings, Monday through Friday, if I
> am off work for any reason, I take the muscle relaxants . . . three
> times a day as prescribed.  On Saturdays and Sundays, I take the
> muscle relaxants three times a day as prescribed.  This medicine
> causes drowsiness and driving is not recommended.

*Id*. at 12-13.  Plaintiff effectively asked defendants to reduce her duties to visiting just one facility a day during the work week and to remove her from the on-call rotation.  In support, she submitted two "Return to Work" forms from her physicians stating (1) that she "needs to work light duty for 2 weeks" due to a back injury and (2) that she needs to "continue at work on light duty" due to neck, back, and tailbone pain. *Id*. at 14-15.

The Assistant Director of Jeff Co DHR, Terri Coley, submitted the request

to CR/EE with a letter recommending denial because "home visits and on-call duties are essential functions of [plaintiff's] job."  Doc. 57-7, Exs. to Jackson Aff., at 11.  CR/EE agreed and recommended that Walley deny the request, noting that "more than one home visit may be necessary on any given day to ensure the safety of children in DHR custody," and recommending that plaintiff should "transfer to a position that does not require her to make home visits as an essential function" if she cannot perform home visits.  *Id*. at 18-19.  Walley agreed, and on September 12, 2007, CR/EE informed plaintiff of the decision.  *Id.*

The record is unclear, but it appears that although defendants kept plaintiff on the on-call rotation, she did not work on-call after September 12, 2007.  Doc. 52-3, Plaintiff Dep., at 191:7-12 (plaintiff did not work on-call while on FMLA leave); Doc. 52-1, Turner Aff., at 10-11 (plaintiff did not work on-call on December 21-24, 2007, or March 22-24, 2008).

b.    *Second accommodation request*

Plaintiff submitted a second accommodation request on January 16, 2008, requesting that Jeff Co DHR remove her from the on-call rotation due to her epilepsy.  Doc. 57-7, Exs. to Jackson Aff., at 21-23.  This time, plaintiff characterized the on-call duties as "marginal functions" since she contended that her position did not exist because of on-call duties and that her performance

8

appraisals from May 1997 to May 2007 failed to mention these duties. *Id*. at 23.

On February 29, 2008, and March 31, 2008, CR/EE asked plaintiff to submit

additional information about her epilepsy from her treating physician. *Id*. at 35.

Instead, plaintiff's attorney responded, stating that plaintiff's condition and

medications "substantially limited . . . the performance of such activities as driving

at night." *Id*. at 37-38.  CR/EE deemed this response insufficient, again asked

plaintiff to submit information from her treating physician, and closed the file

when plaintiff failed to comply.[5]  *Id*. at 39-40.

       *c.     State DHR discovers licensing issues*

      Around the time plaintiff made her second accommodation request, State

DHR informed Givins that it received reports of home daycares in Jefferson

County operating with expired licenses.  Doc. 57-9, Wright Aff., at 2-3; Doc. 57-3,

Givins Aff., at 2.  Thereafter, Muscolino directed Mashego, Givins, and another

supervisor to review the daycare-licensing unit's files.  Doc. 57-2, Mashego Aff.,

at 4.  The three workers "quickly determined that there were serious problems with

the records," causing Muscolino to ask State DHR's Office of Child Care

_____

     [5]As it relates to this accommodation request, plaintiff's failure to provide the requested
information is fatal.  *See e.g.*, *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278,
1287 (11th Cir. 1997) ("Liability simply cannot arise under the ADA when an employer does not
obstruct an informal interactive process; makes reasonable efforts to communicate with the
employee . . . and the employee's actions cause a breakdown in the interactive process.").

Licensing to independently review the files.  Doc. 57-1, Muscolino Aff., at 4; Doc.

57-2, Mashego Aff., at 4.  The review revealed numerous "instances of homes that

had not been licensed in many years, yet were allowed to continue keeping

children" and that "the [daycare-licensing unit] workers were not visiting the

home[s] as required."  Doc. 57-9, Wright Aff., at 4.  As a result, in July 2008, State

DHR directed Muscolino to issue disciplinary charge letters to the daycare-

licensing employees.[6]  Doc. 57-10 at 2-6.  Each employee resigned or retired

thereafter.  Doc. 57-9, Wright Aff., at 2.

> d.    *Plaintiff's grievance against Givins*

On February 12, 2008, near the period Jeff Co DHR reviewed the daycare-

licensing unit's files, plaintiff sent Turner an email entitled "Grievance/Concerns -

---

[6]Lever explained State DHR's disciplinary process as follows:

> A charge letter is the first step in administering any disciplinary action more serious than a warning or reprimand against a DHR employee.  The charge letter notifies the employee about the nature of the charges, the employee's right to an administrative hearing, and the employee's right to review the evidence. . . . The hearing officer considers the evidence and makes a recommendation to the appointing authority.  For DHR county employees, the appointing authority is their county director.  The appointing authority considers the hearing officer's recommendation when making the final decision on the appropriate discipline. The possible disciplinary actions include a Warning, Reprimand, Suspension without pay for up to 30 days, Demotion and Dismissal.  Employees who are dismissed can appeal their dismissal to the State of Alabama Personnel Board, where they are entitled to a post-dismissal hearing.

Doc. 57-10 at 2-3.

Barbara Givins," asserting that Givins created a hostile work environment because on December 4, 2007, Givins "issued a verbal threat, accompanied with negative body language (*i.e.*, rolling the neck), by saying, 'If I get a bad evaluation, the supervisors do not need to think that they are going to get a good evaluation, and the workers do not need to think that they are going to get a good evaluation!'" Doc. 54-1 at 17.  Plaintiff also asserted that on January 31, 2008, Givins "verbally threatened to reprimand me, without the support of any State Policy or daycare policy violation, if she got reprimanded from her supervisor, Kim Mashego."  *Id*. Finally, plaintiff claimed that she first expressed her concerns about Givins to Turner in December 2007.  *Id*.

       e.    *"New Worker" training*

Sometime before March 2008, to address comments from daycare-licensing workers, including plaintiff, that they felt uncomfortable with the on-call duties, Jeff Co DHR decided to send the workers to its standard 12-week training for new employees.  Doc. 54-1 at 58.  Consequently, on March 4, 2008, Mashego asked Givins to identify the employee she planned to send to the "New Worker" training session beginning on March 17, 2008.  *Id*. at 26-27.  Givins responded: "[Plaintiff] has complained the most therefore she is first choice.  However, I believe [Gaines] and [Key] have a greater need." *Id.* at 26.  Givins relayed this to

Turner, who, in turn, told plaintiff that Givins selected her because "she was one who was most current in work."[7] *Id*.; Doc. 52-3, Plaintiff Dep., at 214:9-10.

Although Jeff Co DHR excused plaintiff from her daily duties during the off-site training sessions, doc. 54-1 at 26, 30; doc. 52-1 at 11, plaintiff felt that being "the only one sent to new worker training out of the entire unit," constituted unjustified discipline and voiced this to Turner, Givins, and Mashego.  Doc. 52-3, Plaintiff Dep., at 208:3-10, 212:14-22.  After attending the first two and a half days, plaintiff missed the training on the afternoon of March 19, 2008, and on March 20, 21, 24, 25, and 31, 2008, and April 1, 2008, due to illness and/or medical treatment.  Doc. 54-1 at 34-37, 52; Doc. 52-1, Turner Aff., at 11.  Mashego believed that plaintiff intentionally missed the training to "avoid learning the responsibilities of on-call [and] having to work on the weekends."  Doc. 57-2, Mashego Aff., at 7.

> f.    *On-call assignments and requests not to work*

Before Givins selected plaintiff for the "New Worker" training, Jeff Co DHR scheduled plaintiff to work on-call the weekend of March 22-24, 2008.  Doc. 52-1, Turner Aff., at 11.  However, on March 7, 2008, plaintiff emailed Turner,

---

[7]Jeff Co DHR selected plaintiff before it received the findings from State DHR. Doc. 57-2, Mashego Aff., at 6.

Givins, and Catherine Brooks, the Program Supervisor, that she was "unable to do on-call" that weekend.  Doc. 54-1 at 25.  On March 12, 2008, Brooks replied, "Please explain," to which plaintiff responded, "FMLA."[8]  Doc. 54-1 at 25. Turner responded that "until reasonable accommodations are approved, [plaintiff] will have to work the scheduled on-call or exchange with someone."  Doc. 52-1 at 11.  Turner also sent a memorandum to all daycare-licensing workers stating in part: "On-call is an essential function.  You are required to perform on-call duties pending a decision being made regarding your request for reasonable accommodations."  Doc. 53-2 at 18.  The record is unclear, but it appears that plaintiff neither worked the on-call assignment, nor found a replacement.

On March 25, 2008, plaintiff called in sick.  Doc. 52-1 at 11.  Turner telephoned plaintiff to ask her whether she intended to use FMLA leave for the absence and to inform her that she was rescheduled to work on-call that upcoming weekend.  Doc. 54-1 at 40.  Plaintiff construed the call as harassment, prompting her to email Turner and Givins the following:

> According to my treating physicians doctors [*sic*] notes, I am on
> restricted duty.  Please, refer to the doctor notes that I have previously

---

[8]As stated previously, defendant approved plaintiff for intermittent FMLA leave from May 9, 2007, to May 9, 2008.  Doc. 54-8 at 942, 944.  Although she worked during this period with periodic leave when needed, it seems plaintiff believed erroneously that her FMLA status automatically precluded her from on-call duty.

submitted to you.  Also . . .  you advised me to make sure that I comply with my doctors' note[s] when I submitted them to you.  If you have misplaced them, I attached a copy of them to my FMLA paperwork that was submitted for approval.

I found it quite disturbing that you [Turner] called me at home to harass me.  Therefore, I am respectfully requesting that you and Barbara Givins stop harassing me through office e-mails, memos involving other people, making others aware of my health problems, and calling me at home.

I strongly feel that these actions are being taken against me in retaliation for me enforcing my rights under the Family Medical Leave Act.

Doc. 54-1 at 40-41.  That same day, Turner responded:

The call you received was a courtesy call since you were out to let you know that you were placed on-call for the upcoming weekend and to see if I completed your leave for the past week correctly.  If you feel that that call was harassment, you may go through the proper procedures in filing a grievance.  However, it is still my duty to remind you that on call is an essential part of your job duties. . . .

*Id*. at 40.  Plaintiff responded: "The proper paperwork has been submitted for FMLA requirements.  The FMLA approval was granted in July.  Therefore, I am going to follow my treating physicians' instructions for my treatment."  *Id*. at 45.  In other words, plaintiff again failed to work her on-call assignment, apparently because she felt her intermittent FMLA leave exempted her from on-call duties.

       g.    *Third accommodation request*

On April 3, 2008, plaintiff emailed Turner and Givins that she was

14

"experiencing additional pain and discomfort as a direct result of . . . sitting in the 'New Worker' Training classes for extended periods of time." Doc. 54-1 at 53. In light of the email, Mashego advised plaintiff to complete an accommodation request. *Id.* Plaintiff complied and, on April 8, 2008, submitted a third accommodation request for the "same problems noted on the previous reasonable accommodation requests . . . related to the back, neck, spinal, tail bone areas, epilepsy, in addition to feet problems." Doc. 57-7 at 43. She requested light duty, frequent breaks, and a chair with additional back support. *Id*.

> h.   *2008 performance appraisal*

In April 2008, Jeff Co DHR issued plaintiff her annual performance appraisal.[9] Doc. 57-10, Lever Aff., at 6. DHR evaluates employees using a standard Employee Performance Appraisal form on which the immediate supervisor rates the employee on each job responsibility, which is then reviewed by another supervisor. Doc. 52-2 at 6. The ratings are as follows: 0 - Does Not Meet Standards; 1 - Partially Meets Standards; 2 - Meets Standards; 3 - Exceeds Standards; and 4 - Consistently Exceeds Standards. *Id*. The ratings are totaled,

---

[9]Kelly Lever, the Assistant Director of State DHR's Personnel Office, testified that each month her office sends each county office a list of employees eligible to receive an annual performance appraisal based on the employee's hire date, promotion date, or the date the employee transferred to another job. Doc. 57-10, Lever Aff., at 6. Plaintiff transferred to the daycare-licensing unit in May 1997. Doc. 52-3, Plaintiff Dep., at 56:14 and 62:2.

divided by the number of responsibilities, and then multiplied by 10 for a Responsibility Score, from which the employee's Disciplinary Score is subtracted to attain the employee's overall Performance Appraisal Score. *Id*. The scale is as follows: 6.6 or below - Does Not Meet Standards; 6.7 - 16.5 - Partially Meets Standards; 16.7 - 26.6 - Meets Standards; 26.7 - 36.6 - Exceeds Standards; 36.7 - 40 - Consistently Exceeds Standards. *Id.*

Initially, Turner rated plaintiff as "Exceeds Standards," *i.e.*, 3s, on each job responsibility and submitted the appraisal for Givins's review. Doc. 57-3, Givins Aff., at 4. Although Turner testified that it was contrary to Jeff Co DHR policy for a mid-level or upper-level supervisor to instruct a supervisor on how to rate a subordinate, and even though Givins had not previously instructed her on ratings, doc. 62-2, Turner Dep., at 144, Givins suggested nonetheless that Turner lower plaintiff's specific job responsibility ratings to "Meets Standards," *i.e.*, 2s, because of "the deficiencies [she] had seen in the partial case review" of plaintiff's files. Doc. 57-3, Givins Aff., at 4. Moreover, Givins discussed plaintiff's evaluation with Mashego, who in turn discussed it with Muscolino. Doc. 57-1, Muscolino Aff., at 7. Muscolino instructed Mashego to lower plaintiff's ratings because State DHR's review revealed that 18 percent of the daycares assigned to her operated with expired licenses. *Id*. Muscolino specifically asked Mashego whether

plaintiff earned a 2 for on-call responsibilities, and Mashego responded:

> I would say no, but I am trying to justify a score of 1. She did on-call one time when scheduled and there were no complaints. I know that she purposefully got out of doing the other 2 on-calls, but for a one day surgery and being sick. I just want to make sure I can justify the 1.

Doc. 60-1 at 1. Muscolino responded: "You can justify it. She has asked for training. She has been provided training. She is avoiding training." *Id*.

Ultimately, on April 21, 2008, plaintiff received a Responsibility Score of 13.8 and a Disciplinary Score of 0, for an overall Performance Appraisal Score of 13.8, *i.e.*, Partially Meets Standards. Doc. 57-3 at 5. The "Responsibilities" portion of her evaluation states:

| *Responsibility* | *Rating* |
|---|---|
| 1. Carries out intake responsibilities in order to complete licensing process | 1 |
| 2. Monitors compliance of licenses [Family Daycare] Providers | 1 |
| 3. Monitors compliance of licensed [Family Daycare] Providers – Annual Review | 1 |
| 4. Investigates [Family Daycare] complaints | 2 |
| 5. Dictates, prepares documents, organizes records and completes forms | 1 |
| 6. Organizes and conducts [Family Daycare] workshops, participates in inter/intra agency meetings | 2 |
| **7. Performs on-call responsibilities** | **1** |
| 8. Treats clients, the public and other employees with respect and dignity. | 2 |

Doc. 52-2 at 6 (emphasis added). Turner attached a memorandum to the appraisal

17

stating:  "A complete desk audit was conducted of [plaintiff's] family daycare

licensing caseload.  Eighteen percent of her cases reviewed were identified as

being out of licensure requirements.  As a result, [plaintiff] received a rating of 1

in the following areas . . . ."  Doc. 52-2 at 7.  For on-call responsibilities, the

memorandum states that "[plaintiff] failed to perform on-call duties in compliance

with Alabama statutes, local policy, procedures, and directives."  *Id.*

       As a result of her Performance Appraisal Score, plaintiff did not receive an

annual raise in July 2008.[10]  Doc. 66-8, Plaintiff's personnel file, at 1 ("7-08 -

Eval. did not merit a raise"); Doc. 52-3, Plaintiff Dep., at 238:20 ("On my last

evaluation I received a low score of partially meets standards.  And according to

the State policy that does not merit a raise.  Therefore, I was denied a raise.").

               I.      *Request for excuse from "New Worker" training*

       When plaintiff received her evaluation, she requested that defendants

remove her from the "New Worker" training because of "a significant amount of

increased pain and discomfort to [her] body."  Doc. 54-1 at 64-65.  Mashego

responded:

       You have been participating in the New Employee training as part of
       your concerns with working on-call includ[ing] that you had limited

_____

       [10]The record indicates that annual raises, if justified, are effective two to three months
after the performance appraisal.  *See* Doc. 57-2 at 10-30.

experience with completing [child abuse and neglect], foster care, and family preservation related job functions.  To increase your experience with these job duties you are attending training specifically designed to prepare employees for these job duties.

Doc. 54-1 at 67.  Thereafter, plaintiff missed the training for medical reasons on April 25, 2008, and May 2, 6, and 9, 2008.  *Id.* at 71, 73.

> j.     *First EEOC charge*

The day after her evaluation, April 22, 2008, plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge against "State Alabama - DHR,"[11] alleging race and sex discrimination:

On or about March 12, 2008, I began receiving harassing e-mails about my FMLA status.  On or about April 21, 2008, I received a performance evaluation reflecting a low score.  In the past, I have always received good evaluations . . . .  I have been required by the employer to respond to "on call" requests while being on Family Leave.  I am aware of another Caucasian female that has been excused from "on call" requests.  I am also aware of a male coworker receiving much higher evaluations scores, and I . . . have resolved or completed his case work.

Doc. 1, Ex. to Complaint, at 9.

Several weeks later, when Jeff Co DHR failed to assign the other daycare-licensing unit employees to the "New Worker" training that started on May 12,

---

[11]Plaintiff listed the street address for "State Alabama - DHR" as "11 West Oxmoor, Suite 600, Birmingham, AL 35209."  Doc. 1, Ex. to Complaint, at 9.  Although she did not specifically list Jeff Co DHR, that she used Jeff Co DHR's address gave it sufficient notice of the charge.  Indeed, Jeff Co DHR is not asserting that plaintiff failed to file an EEOC charge against it.

2008, plaintiff complained that "it really appears that I am being subjected to disparate treatment."  Doc. 66-16 at 1.  Mashego testified that they intended to send the other employees, but that "by the time that the next class was scheduled to start in May 2008, a decision had been made to issue disciplinary charge letters to all of the daycare workers."  Doc. 57-2, Mashego Aff., at 6.

### k.    *Fourth accommodation request*

On May 22, 2008, while her third accommodation request (submitted on April 8, 2008) was pending, plaintiff submitted a fourth seeking "removal from the on-call rotation, a suitable office chair (cushioned and elevates), and a heater" because of her "back, neck, tail bone, spinal, and foot problems."  Doc. 57-7 at 59. In support, plaintiff submitted a May 6, 2008, letter from a physician at the UAB Epilepsy Center, stating in part:

> [Y]ou had a past history of seizures.  These have been under excellent control for many years and do not create any difficulty with normal activities including driving or working as a social worker.  You can perform all of the usual activities of your job.

> However, sleep loss is a known precipitant of seizures and you had a couple of episodes of brief confusion in January 2007 and April 2007, after being up all night on-call for 24 hours.  Since this is an infrequent part of your job, I recommend that you be exempted from being on call for this length of time. . . .  Otherwise, you should be able to do your job well and with this accommodation I do not believe you will have any seizures.

Doc. 66-9 at 2.  Plaintiff also submitted a May 15, 2008, letter from a physician at

Alabama Orthopaedic Center, P.C., stating in part:

> [Plaintiff] continues to experience pain and stiffness in her back and
> tailbone areas and has difficulty with any bending, lifting, walking,
> sitting or standing for prolonged periods of time.  Currently she's
> taking medication that is sedative in nature and is unable to work on-
> call.  It is not in her best interest as well as for others to drive or make
> critical decisions concerning the safety of the children.

*Id*. at 3.

> On June 30, 2008, defendants denied plaintiff's third and fourth requests:

> CR/EE and Commissioner Walley have denied your request for
> removal from on-call rotation because your appointing authority has
> stated that this is an essential function of your job.  An employer is
> not required to reallocate essential functions of a job which a
> qualified individual must perform.  Because "on-site" or "field"
> investigations are an essential part of your job, DHR is not required to
> accommodate you under the ADA.  Moreover, you have not
> established that you have a "disability" under the ADA, *i.e.*, a
> physical or mental impairment that substantially limits a major life
> activity which includes functions such as caring for one's self,
> performing manual tasks, walking, seeing, hearing, speaking,
> breathing, learning, and working.

> Your request for a cushioned chair that elevates while in training is
> no longer applicable because your appointing authority has stated that
> your training ended on June 6, 2008, and you have returned to your
> office where your chair is cushioned and elevates.

> Your request for a heater is denied because your appointing authority
> has stated that heaters are prohibited in the building.

> Your request for frequent breaks is denied because this would be a

21

violation of personnel policy.  You are authorized two 15-minutes breaks per day plus lunch and restroom breaks.

All of the above requests are also denied because you have not established that you have a disability under the ADA.

Doc. 57-8 at 41-42.  However, before CR/EE formally conveyed the decision to plaintiff, Muscolino learned that the fourth accommodation request included a doctor's note that plaintiff's medications could make her drowsy.  Therefore, she removed plaintiff from the on-call rotation for June 13-16, 2008.  Doc. 57-1 at 10. In other words, despite Walley's denial, defendants accommodated plaintiff.[12]

## l.   *Disciplinary charges against plaintiff and co-workers*

In letters dated July 7, 2008, Jeff Co DHR charged plaintiff, Henderson, Gaines, and Baxley with "failure to perform job properly" and "serious violation of many other department rules" for their alleged failure to properly license home daycares.[13]  Doc. 57-10 at 9-10, 15-20.  The next week, Jeff Co DHR issued charge letters to Turner and Givins for failure to supervise the workers and the unit, respectively.  *Id.* at 21-24.  The letters informed the employees of upcoming administrative hearings and that they faced suspension, demotion, or termination.

[12]As noted previously, although defendants scheduled plaintiff to work on-call after it denied her first accommodation request on September 12, 2007, plaintiff never worked an on-call shift thereafter.  Doc. 52-3, Plaintiff's Dep., at 191:7-12; Doc. 52-1, Turner Aff., at 10-11.

[13]Key, the other employee in the unit, submitted her retirement application in April 2008. Doc. 57-10 at 3.  As a result, she did not receive a disciplinary charge letter. *Id*.

22

### m.     Second EEOC charge and resignation

Two days after receiving the charge letter, plaintiff filed another EEOC charge against "State Alabama DHR," alleging discrimination and retaliation due to the denial of her accommodation requests.  Doc. 1, Ex. to Complaint, at 7.  Thereafter, on August 25, 2008, plaintiff resigned effective September 5, 2008, stating simply: "I am writing this letter to inform you that I will be resigning in two weeks.  It has been a true pleasure working in and being a member of the Family Daycare Licensing Unit."  Doc. 57-10 at 25.  Plaintiff testified that she resigned because defendants forced her to work on-call, and she did not believe that her upcoming administrative hearing would be impartial.  Doc. 52-3, Plaintiff's Dep., at 229-30.

Although Baxley, Henderson, and Turner contested their respective charges, the hearing officer recommended their termination.  Doc. 57-10 at 5.  Baxley and Henderson ultimately agreed to withdraw their respective appeals in exchange for DHR allowing them to resign.  *Id*. at 6.  Gaines submitted her retirement application on October 31, 2008, Jeff Co DHR terminated Turner on November 12, 2008, and Givins received a two-week suspension.  Doc. 57-10 at 26-27, 43.

**B.**     *Comparators*

*1.     On-call Duties*

In April 2007, Key, an African-American female, also requested that she be "taken off the on-call list duties" because of arthritis, tendinitis, and foot pain. Doc. 57-8 at 56.  At CR/EE's recommendation, Walley denied Key's request because Jeff Co DHR "is not required to reallocate or redistribute essential functions and because on-call duty is required at such infrequent intervals."  *Id.*

In February 2008, Baxley, a Caucasian female, requested that Jeff Co DHR remove her from the on-call rotation due to side effects from her bipolar disorder medication.  *Id.* at 44.  CR/EE recommended denial of Baxley's request also because on-call duties are an essential function, and Walley agreed.  *Id.* at 52-53. However, Jeff Co DHR removed Baxley from the on-call rotation nonetheless because it feared that she posed a safety risk:

> [Baxley] was not doing on-call duty . . . because she had a serious mental health condition.  She had a diagnosis that she was bipolar and she had been hospitalized for this condition in the past.  There was a concern, which I [Muscolino] agreed with, that she could pose a safety risk to children if she responded to an on-call emergency in the middle of the night.  Additionally, according to her doctor's statements, she took medication that made her sleepy during the evening.  On-call workers often have to transport children to foster homes and I was concerned that she could have an accident while driving.

24

> . . . [Despite the denial of her accommodation request] it was decided
> that she would still not perform on-call duties due to the safety
> concerns that I discussed above.

Doc. 57-1, Muscolino Aff., at 9.  Thus, according to Muscolino, she removed

Baxley – and also plaintiff – from the on-call rotation not as an accommodation,

but rather "because their medical conditions and/or medication create a risk to the

children that they might have to transport at night."  *Id.* at 10-11.

    2.   *Performance Appraisals*

    Plaintiff challenges also her 2008 performance appraisal and the resulting

denial of her annual raise and contends that defendants rated her lower than

Baxley and Henderson for discriminatory reasons.  Jeff Co DHR issued the

following scores for the 2007-2008 period:

| Employee | Performance Appraisal Score | Date Issued |
| --- | --- | --- |
| Baxley | 24.3 | December 13, 2007 |
| Henderson | 27.5 | February 7, 2008 |
| Key | 10 | April 15, 2008 |
| Turner | 12.5 | April 16, 2008 |
| Gaines | 15 | April 18, 2008 |
| Plaintiff | 13.8 | April 21, 2008. |

Doc. 57-2, Exs. to Mashego Aff., at 15-30.  Baxley received the following

responsibility scores:

| Responsibility | Ratings |
|---|---|
| 1.   Carries out intake responsibilities in order to complete licensing process | 3 |
| 2.   Monitors compliance of licenses Family Day Care Providers . . . Relicensing | 2 |
| 3.   Monitors compliance of licensed Family Day Care Providers . . . Annual | 2 |
| 4.   Investigates Family Day Care Complaints | 2 |
| 5.   Dictates, prepares documents, organizes records and completes forms | 2 |
| 6.   Organizes and conducts [Family Daycare] workshops, participates in inter/intra agency meetings | 3 |
| 7.   Treats clients, the public and other employees with respect | 3 |

*Id*. at 26.  Henderson received the following:[14]

| Responsibility | Ratings |
|---|---|
| 1.   Carries out intake responsibilities in order to complete licensing process | 3 |
| 2.   Monitors compliance of licenses [Family Daycare] Providers | 3 |
| 3.   Monitors compliance of licensed [Family Daycare] Providers . . . Annual Review | 2 |
| 4.   Investigates [Family Daycare] Complaints | 3 |
| 5.   Dictates, prepares documents, organizes records and completes forms | 3 |
| 6.   Organizes and conducts [Family Daycare] workshops, participates in inter/intra agency meetings | 3 |
| 7.   Performs on-call responsibilities | 2 |
| 8.   Treats clients, the public and other employees with respect and dignity | 3 |

---

[14]Like plaintiff, Baxley and Henderson each had a zero Disciplinary Score so their Performance Appraisal Scores consisted solely of their Responsibility Scores.

Doc. 57-2 at 29.  Plaintiff testified that Baxley and Henderson received annual

raises due to their appraisal scores.  Doc. 52-3, Plaintiff Dep., at 239:4-8

("According to Ms. Baxley she received a favorable evaluation.  Mr. Henderson

received a favorable evaluation, and, therefore, they were granted a raise.").

## C.   *Procedural History*

The EEOC issued plaintiff right-to-sue notices in February 2009.  Doc. 1,

Exs. to Complaint, at 6, 8.  Plaintiff filed a timely Complaint in April 2009, doc. 1,

and amended it in February 2010, doc. 30, and again in April 2010, doc. 36.  The

Second Amended Complaint is a quintessential "shotgun pleading"[15] in which she

incorporates all her facts into a "Causes of Action" section that does not

enumerate counts and broadly alleges:

> Defendants discriminated and retaliated against Plaintiff with respect
> to job duties, and assignments, job evaluations, pay, working
> conditions, hiring, promotion, hostile work environment, discipline,
> and other terms and conditions of employment in violation of Title
> VII of the Civil Rights Act 1964, 42 U.S.C. Section 2000e, *et seq.*, as
> amended by the Civil Rights Act of 1991; 42 USCS Section 12112 as
> amended; and U.S.C. Sections 1981 and 1981A, 1983; 42 U.S.C.
> 2000e-5(b), 29 U.S.C. 626, 42 U.S.C. 12117.

Doc. 36 ¶ 27.  In other paragraphs, plaintiff vaguely invokes additional forms of

---

[15]Shotgun pleadings are strongly disfavored.  *See e.g.*, *Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 979 n.54 (11th Cir. 2008) ("[S]ince 1985 we have explicitly condemned shotgun pleadings upward of fifty times.").  It appears plaintiff's inadequate pleadings avoided scrutiny because defendants never moved to dismiss.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009).

discrimination and retaliation with allegations that "[she] suffered unlawful

employment practices, including . . . receiving harassing e-mails and phone calls

about her FMLA status, on-call duties, and her requests for reasonable

accommodations," "[she] was subjected to disparate treatment," and "[she] was

forced to seek employment elsewhere and was thereby constructively discharged."

*Id*. ¶¶ 20, 24, and 26.  Finally, plaintiff seeks a declaratory judgment that "the

employment practices, policies, procedures, conditions and customs of

defendants" violate Title VII and §§ 1981 and 1983, and a permanent injunction.

Doc. 36 at 5 ¶¶ 1-2 .

In short, while not artfully pled, it appears that plaintiff asserts claims of

discrimination and retaliation in violation of Title VII, 42 U.S.C. §§ 1981 and

1983, the FMLA, and Title I of the ADA[16] against State DHR, Jeff Co DHR, and

---

[16]Plaintiff references Title II of the ADA, 42 U.S.C. § 12131 *et seq*., in the "Jurisdiction and Venue," section of her Complaint.  Doc. 36 ¶¶ 1, 2.  However, it does not appear that she is pursuing a Title II claim because it is not included in her "Causes of Action."  *See id*.  She cannot pursue such a claim anyway because State DHR and Jeff Co DHR have immunity.  Although neither the Supreme Court nor the Eleventh Circuit has specifically addressed Eleventh Amendment immunity for Title II claims in the employment-discrimination context, *see Tennessee v. Lane*, 541 U.S. 509, 530-31 (2004) (accessibility of judicial services); *United States v. Georgia*, 546 U.S. 151 (2006) (prison accommodations); *Garrett v. University of Alabama Board of Trustees*, 531 U.S. 356, 360 n.1 (2001) (issue not briefed), the Supreme Court's analytical framework in *Garrett* related to Title I has led at least three district courts in this circuit to find that Congress likewise improperly abrogated the States' Eleventh Amendment immunity in Title II by failing to adequately identify a pattern of irrational State conduct in the state-employment discrimination context.  *See Clifton v. Georgia Merit Sys.*, 478 F. Supp. 2d 1356, 1368 (N.D. Ga. 2007) ("the Supreme Court's holding in *Garrett* that '[t]he legislative record of the ADA . . . simply fails to show that Congress did in fact identify a pattern of

the individual defendants, individually and in their official capacities.[17]

## III.  DISCUSSION

The court now turns to the parties' motions for summary judgment and the merits of plaintiff's claims.  In Section A, the court addresses the claims against the individual defendants and finds that no individual liability exists under Title VII, the FMLA, or the ADA.  Thus, if plaintiff can prevail at all against them, it will be under §§ 1981 and 1983.  In Sections B and C, the court addresses the FMLA and ADA claims against State DHR and Jeff Co DHR and finds that both entities have Eleventh Amendment immunity.  Finally, in Sections D, E, and F, the court addresses the Title VII claims against State DHR and Jeff Co DHR and the §§ 1981 and 1983 claims against all defendants and finds that only plaintiff's Title VII race-discrimination claim against Jeff Co DHR survives summary judgment.

_____

irrational state discrimination in employment against the disabled' is equally applicable to employment discrimination claims under Title I and Title II of the ADA"); *Leverette v. Alabama Revenue Dep't,* 453 F. Supp. 2d 1340, 1345 (M.D. Ala. 2006) ("it would be illogical to find that history of state discrimination against the disabled in employment is insufficient to permit Congress to enact Title I, but that that same history is somehow sufficient to allow Congress to fashion Title II"); *Williamson v. Georgia Dep't of Human Res. & Georgia Reg'l Hosp.*, 150 F. Supp. 2d 1375, 1381-82 (S.D. Ga. 2001).  The court finds these opinions persuasive and agrees that Congress did not properly abrogate the Eleventh Amendment in Title II with regard to employment-discrimination claims.  Accordingly, to the extent plaintiff intended to plead a Title II claim, it fails as a matter of law.

[17]Although the Complaint also cites 29 U.S.C. § 626, *i.e.*, the Age Discrimination in Employment Act, the court assumes that the reference was in error because plaintiff did not allege age discrimination or mention her age in her EEOC charges or elsewhere in the Complaint.

**A.   *Individual Defendants***

Plaintiff's Title VII, FMLA, and ADA claims, if any, against the individual defendants fail as a matter of law because no individual liability exists under these statutes.  *See Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) (no individual liability exists under Title VII); *Wascura v. Carver*, 169 F.3d 683, 687 (11th Cir. 1999) (no federal jurisdiction exists under FMLA for claims against a public official in his or her individual capacity); *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996) (no individual liability exists under the ADA); *Pears v. Mobile Cnty.*, 645 F. Supp. 2d 1062, 1077 (S.D. Ala. 2009) (an official-capacity suit against an individual defendant is redundant when the employer is also a defendant).

Additionally, Buckner and Rice are entitled to summary judgment on *all* claims against them individually because each assumed her respective position *after* plaintiff's resignation.  Indeed, plaintiff failed to produce any evidence indicating their involvement in the underlying facts.

**B.   *FMLA Claims***

Plaintiff's claims, if any, under the self-care provision of the FMLA against State DHR and Jeff Co DHR are barred by the Eleventh Amendment, which permits suits against a State only if it has waived its sovereign immunity or

Congress has validly abrogated States' immunity, neither of which applies here. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). In *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 735 (2003), the Supreme Court held that Congress validly abrogated States' Eleventh Amendment immunity for claims arising under the FMLA's *family-care*, but the Eleventh Circuit has declined to extend *Hibbs* to the *self-care* provision,[18] *see Batchelor v. South Florida Water Management District*, 242 Fed. App'x 652, 652 (11th Cir. 2007) ("Our holding in *Garrett* [*v. University of Alabama at Birmingham Board of Trustees*, 193 F.3d 1214, 1219 (11th Cir. 1999),] that Congress is without authority to abrogate state sovereign immunity for claims arising under the self-care provision of the FMLA remains the law of this Circuit").[19] Therefore, State DHR and Jeff Co DHR, as arms of the state, are immune from plaintiff's FMLA claims. *See e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (arms of the State are entitled to sovereign immunity).

_____

[18]Plaintiff sought and received FMLA for her own ailments, rather than to care for a family member. Consequently, her claim, if any, is under the self-care provision.

[19]The Fifth, Sixth, Seventh, and Tenth Circuits have also declined to extend *Hibbs* to the *self-care* provision of the FMLA. *See Nelson v. Univ. of Texas at Dallas*, 535 F.3d 318, 321 (5th Cir. 2008); *Toeller v. Wis. Dep't of Corr.*, 461 F.3d 871, 877-80 (7th Cir. 2006); *Touvell v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 422 F.3d 392, 400-05 (6th Cir. 2005); *Brockman v. Wyo. Dep't of Family Servs.*, 342 F.3d 1159, 1164-65 (10th Cir. 2003).

C.     *ADA Claims*

Plaintiff contends that defendants violated Title I of the ADA by failing to

grant her the following accommodations: "light duty," *i.e.*, one home visit per

eight-hour shift; removal from the on-call rotation; frequent breaks; a chair with

additional back support; and a heater.  Doc. 57-7 at 7, 21-23, 43, 59.  However,

State DHR and Jeff Co DHR are also entitled to Eleventh Amendment immunity

from the ADA claims.  In *Garrett*, the Supreme Court held that Congress failed to

properly abrogate States' Eleventh Amendment immunity with respect to state-

employment discrimination because it neither identified a pattern of irrational

discrimination by States against the disabled, nor sufficiently targeted the statute

to remedy discrimination in public employment.[20] 531 U.S. at 374; *see also Rizo v.*

*Ala. Dep't of Human Res.*, 228 Fed. App'x 832, 834-35 (11th Cir. 2007)

(affirming dismissal of Title I claims against DHR on Eleventh Amendment

immunity).  Accordingly, summary judgment is warranted on the ADA claims.[21]

_____

[20]The *Garrett* Court noted that private individuals with disabilities may seek injunctive relief under *Ex parte Young*, 209 U.S. 123, 157 (1908) but, here, plaintiff has not sought injunctive relief under the ADA, *see* doc. 36 at 5 ¶ 2.

[21]Alternatively, the ADA claim fails because plaintiff failed to show that she is a qualified individual with a disability.  For example, the May 2008, letter from the Epilepsy Center states "you *had* a past history of seizures. . . . [t]hese have been under excellent control for many years and do not create *any* difficulty with normal activities including driving or working as a social worker," doc. 66-9 at 2 (emphasis added), which, of course, refutes her contention of a disabling condition.  Likewise, the May 2008, letter from the Alabama Orthopedic Center states that she "continues to experience pain and stiffness in her back and tailbone areas and has difficulty with

**D.      Section 1981 Claims**

Plaintiff's § 1981 claims against State DHR, Jeff Co DHR, and the

individual defendants in their official capacities are merged with her § 1983

claims. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989); *Butts v.*

*Cnty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000) (applying *Jett* to hold "§

1983 constitutes the exclusive remedy against state actors for violations of the

---

any bending, lifting, walking, sitting or standing for *prolonged periods of time*." Doc. 66-9 at 3 (emphasis added). A disability under the ADA must substantially limit a major life activity, and the Eleventh Circuit instructs that "someone who walks [and] . . . stands . . . moderately below average is not disabled." *Rossbach v. City of Miami*, 371 F.3d 1354, 1358 (11th Cir. 2004).

   Moreover, even if she has a substantial limitation, plaintiff must also prove that she is a "qualified individual with a disability." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). "If the individual is unable to perform an essential function of [her] job, even with an accommodation, [she] is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007) (quotation marks and citation omitted). Here, plaintiff seeks to get around this requirement by claiming that the on-call function is "marginal," rather than essential, because the "only official documentation available clearly established that the on-call duties for Day Care workers did not become apart [*sic*] of their general job requirements until February 8, 2008," doc. 62 at 4 ¶ 9, and/or because it is only required a few times a year. However, nothing prohibits an employer from adding essential functions to a position after the fact. *See e.g.*, *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1364 n.3 (11th Cir. 1999) (absent a showing that employer changed essential functions to discriminate against employee, employer can change a cashier's job to require her to bend, stoop, and carry heavy weights even though plaintiff could not do so because of her osteoarthritis). Likewise, that defendants assigned the on-call duties on a rotating basis and thus only required each employee to perform them "a few times a year," doc. 57-1, Muscolino Aff., at 11, does not mean that the on-call requirement is "marginal." To the contrary, the court need only look at the role daycare-licensing workers play to see easily that on-call is an essential function of their positions. DHR is charged with protecting children year round, including weekends and holidays. While each worker may only have to be on-call a few times a year – a significant benefit to the workers – the function itself never ceases. Indeed, that DHR can only carry out its vital function of ensuring the safety of children through its employees further underscores why it is important that *all* employees perform these tasks. Where, as here, plaintiff contends that she cannot work on-call or can only visit one home a day, she cannot perform the essential functions and is, therefore, not a qualified individual with a disability.

rights contained in § 1981"). Accordingly, as it relates to § 1981, only the individual capacity claims against the individual defendants remain. Moreover, for the reasons stated *infra* in Section F, these defendants are due summary judgment.

**E.    *Section 1983 Claims against State DHR, Jeff Co DHR, and the Individual Defendants in their Official Capacities***

Plaintiff's monetary damage claims under § 1983 against State DHR, Jeff Co DHR, and the individual defendants in their official capacities are barred because Alabama has not waived its sovereign immunity for such claims, and "Congress did not intend to abrogate a state's eleventh amendment immunity in section 1983 damage suits."[22] *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986). Thus, State DHR and Jeff Co DHR are immune and entitled to summary judgment.[23] The same analysis applies also to the individual defendants in their official capacities because these claims are against their respective state

---

[22]Defendants note the Complaint is unclear on whether plaintiff is pursing § 1983 claims for alleged violations of rights created by the FMLA or the ADA. Doc. 58 at 17 n.4. However, where Congress has adopted a specific remedial framework, as it did with the FMLA and ADA, that framework forecloses an action under § 1983. *See Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers*, 453 U.S. 1, 20 (1981) ("When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983."); *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1531 (11th Cir. 1997) (ADA forecloses an action under § 1983).

[23]The claim fails also because neither State DHR, nor Jeff Co DHR is "a person within the meaning of § 1983." *See Will v. Michigan State Dep't of Police*, 491 U.S. 58, 65 (1989).

agencies.[24]  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (an official-

capacity action is, in actuality, a suit against the governmental entity).

Notably, under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), the

Eleventh Amendment does not preclude private actions against state officials for

prospective relief, such as the injunction plaintiff seeks here, designed to remedy

ongoing violations of federal law.[25]  *See Puerto Rico Aqueduct and Sewer Auth. v.

Metcalf & Eddy*, 506 U.S. 139, 146 (1993) (although prospective relief is available

against state officials, it is not available against state agencies); *Edelman v.

Jordan*, 415 U.S. 651, 663-64 (1974) (Eleventh Amendment does not bar suit to

compel future state compliance with federal standards).  The injunction claim is

moot, however, since plaintiff resigned and, as shown below, failed to establish

constructive discharge.  *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1302 (11th

Cir. 2007) ("Because injunctions regulate future conduct, a party has standing to

seek injunctive relief only if the party alleges, and ultimately proves, a real and

immediate – as opposed to a merely conjectural or hypothetical – threat of future

---

[24]The Eleventh Amendment typically does not preclude claims for damages against government officials in their *individual* capacities; however, as discussed in Section F, the individual defendants are entitled to qualified immunity from the discrimination claims.

[25]However, State DHR and Jeff Co DHR are immune from the request for a declaratory judgment because a plaintiff "may not use the doctrine to adjudicate the legality of past conduct." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999).

injury" (quotation marks and citations omitted)).

## F.    *Title VII & Sections 1981 and 1983*

Plaintiff alleges also that State DHR, Jeff Co DHR, and the individual

defendants discriminated and retaliated against her in violation of Title VII and §§

1981 and 1983 "with respect to job duties and assignments, job evaluations, pay,

working conditions, hiring, promotion, hostile work environment, discipline, and

other terms and conditions of employment."[26]  Doc. 36 ¶ 27.  The court deems the

hiring and promotion claims abandoned because the evidentiary record and the

briefing are silent on these claims.  Further, as discussed in Sections D and E, the

§ 1981 claims against State DHR, Jeff Co DHR, and the individual defendants in

their official capacities are merged into the § 1983 claims, and those defendants

are immune from monetary damage claims under § 1983.  Moreover, the claim for

prospective relief is not applicable here since plaintiff resigned.  Thus, the §§ 1981

and 1983 claims remain only against the individual defendants in their individual

capacities, and the Title VII claims remain only against State DHR and Jeff Co

DHR.

---

[26]"[T]he analysis of disparate treatment claims under § 1983 [and § 1981]  is identical to the analysis under Title VII where the facts on which the claims rely are the same." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

*1.     Race and Sex Discrimination: Disparate Treatment*

Plaintiff alleges that defendants discriminated against her on the basis of race and gender by subjecting her to "disparate treatment in the terms and conditions of her employment including, unjustified discipline, denial of basic support by defendants, denial of earned leave, and other actions intended to harass, intimidate, and deter [her] from pursuing her claims of discrimination, and to force her failure in performance, or involuntary resignation."  Doc. 36 ¶ 24.  To support her claims, plaintiff alleges that "a Caucasian female [Baxley] has been excused from 'on-call' requests during the same period [and] that [an African-American] male [Henderson] received high[er] performance evaluation scores and the Plaintiff often resolved or completed his casework in addition to her own and received a lower performance evaluation."[27]  *Id*. ¶ 22.

A plaintiff in a discrimination action may attempt to prove her claim either by direct or circumstantial evidence.  Here, plaintiff utilizes both methods.

*a.     Direct Evidence*

"Direct evidence is evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d

---

[27]Plaintiff alleges that "a Caucasian male received high performance evaluation scores," however, it is undisputed that she is referring to Henderson. Doc. 36 ¶ 22.

1079, 1086 (11th Cir. 2004) (quotation marks and citations omitted). "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Id*. Therefore, "direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quotation marks and citations omitted).

Plaintiff argues that Jeff Co DHR's exemption of Baxley from on-call duties and the higher evaluation ratings for Baxley and Henderson constitute direct evidence of discrimination. Doc. 66 at 22. The court disagrees because these acts do not prove discrimination "without inference or presumption." *Wilson*, 376 F.3d at 1086. At best, they *suggest* only a possible discriminatory motive. Thus, this evidence, at most, is circumstantial and falls under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework.

b.   *Circumstantial Evidence*

Under *McDonnell Douglas*, plaintiff must first create an inference of discrimination by establishing a *prima facie* case. *See Burke-Fowler v. Orange Cnty. Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation marks and citation omitted). If she satisfies her initial burden, "the defendant must show a legitimate, non-discriminatory reason for its employment action." *Id*. "If it does so, then the

38

plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id.* However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (quotation marks and citation omitted).

To make a *prima facie* case of race or sex discrimination, a plaintiff must show: "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler*, 447 F.3d at 1323 (quotation marks and citation omitted). Here, the parties dispute only the second and third elements — adverse employment action and disparate treatment.

### i.    Adverse employment action

An adverse employment action is "an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Here, plaintiff identifies two adverse employment actions: an alleged constructive

discharge and denial of her annual raise in July 2008.  Doc. 36 ¶ 26.

The Eleventh Circuit has long recognized that constructive discharge may

constitute an adverse-employment action.  *See Morgan v. Ford*, 6 F.3d 750, 755

(11th Cir. 1993).  However, the threshold "is quite high."  *Hipp v. Liberty Nat'l*

*Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001).  A plaintiff must prove that

her working conditions "were so difficult . . . that a reasonable person would have

felt compelled to resign."  *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d

1272, 1282 (11th Cir. 2003).

Here, plaintiff cannot make the requisite showing because the primary

working conditions she complains about – on-call duties and the "New Worker"

training – ended in June 2008, *i.e.*, before she resigned on August 25, 2008.  *See*

Doc. 66 ¶ 14.  Moreover, employee resignations are presumed voluntary, except if

under duress or due to deceit or misrepresentation of a material fact, *see Hargray*

*v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995), and neither exception

applies here.  Further, "resignations can be voluntary even where the only

alternative to resignation is facing possible termination for [good] cause," because

the employee had a choice.  *Id*.  Although plaintiff faced potential termination, she

chose to resign nonetheless and, in fact, characterizes her time at Jeff Co DHR as

"a true pleasure."  Doc. 57-10 at 25.  Therefore, she cannot establish a constructive discharge.

Plaintiff relies also on the denial of her annual raise in July 2008 as evidence of an adverse action.  Doc. 66-8 at 1.  The law is clear that a "poor performance evaluation that directly results in the denial of a pay raise of any significance . . . constitutes an adverse employment action under Title VII." *Crawford v. Carroll*, 529 F.3d 961, 971 (11th Cir. 2008).  Therefore, plaintiff established the adverse employment prong of her *prima facie* case.

### ii.    Disparate Treatment of Similarly Situated Comparator

The court now turns to the final element – *i.e.*, whether plaintiff can show that defendants treated similarly situated employees outside of her protected class more favorably as it relates to appraisals and annual raises.  Eleventh Circuit law is well settled that the "plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects."  *Wilson*, 376 F.3d at 1092 (quotation marks and citations omitted).  This requirement necessarily "prevents courts from second-guessing employer's reasonable decisions and confusing apples with oranges."  *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999).

As purported comparators, plaintiff contends that defendants treated Baxley, a Caucasian female, and Henderson, an African-American male, more favorably

41

by giving them higher ratings and an annual raise.  Defendants counter that Baxley

and Henderson are not similarly situated because Jeff Co DHR completed their

performance appraisals in December 2007, and February 2008, respectively,

*before* discovering the significant problems in the daycare-licensing unit, while

plaintiff received her appraisal on April 21, 2008, *after* State DHR reported the

problems.  Thus, unlike Baxley and Henderson, defendants note that they

evaluated plaintiff with knowledge that 18 percent of the daycares assigned to her

operated with expired licenses, and that this knowledge led to her unfavorable

ratings.

The court disagrees that the timing of the appraisals *alone* fully

distinguishes Baxley and Henderson and finds instead that plaintiff is similarly

situated to them because they held the same position and were also evaluated

annually.  Moreover, that defendants evaluated all the daycare-licensing workers

except Baxley, the only non-African American, on "Performs on-call

responsibilities" creates a genuine issue of material fact about whether they treated

Baxley more favorably than plaintiff.  Indeed, for "on-call responsibilities,"

plaintiff received a 1 and Key, Gaines, and Henderson received a 2, while Baxley

received no rating.  *Id*.  Thus, unlike plaintiff, on-call duties played no role in

42

Baxley's Performance Appraisal Score and her resulting annual raise, if any.[28]
The court notes that plaintiff alleges that defendants exempted Baxley from the
on-call duties and never required her to work on-call, which, if true, might explain
why Baxley was not rated in this category.[29]  While defendants may be able to
convince a jury that they had non-discriminatory reasons for treating Baxley
differently, *i.e.*, the safety risk from her bipolar medication, at this juncture of the
litigation, the court must view the facts in the light most favorable to plaintiff, and,
thus, finds that plaintiff established a *prima facie* case of race[30] discrimination in
the context of job duties and pay.

---

[28]The record does not establish whether Baxley received a raise.  Baxley's evaluation
states "Annual Raise Effective: March 2008," and defendants have not produced evidence
indicating that they denied the raise or rescinded it in light of the licensing problems in the unit.
Doc. 57-2 at 25.  Therefore, the court assumes that Baxley received a raise.  Obviously, if the
evidence at trial establishes that Jeff Co DHR did not give Baxley a raise in 2008, this fact will
undermine plaintiff's contention that defendants treated her differently than Baxley as it relates to
pay.  However, even if Baxley did not receive a raise, Jeff Co DHR will still have to rebut
plaintiff's contention that it exempted Baxley from on-call duties.

[29]As justification for not evaluating Baxley for on-call duties, defendants note that it did
not add on-call duties to the annual Performance Appraisal responsibilities until February **8**,
2008.  However, they neither provide a reason why they added the duties on this date, nor explain
why Henderson's February **7**, 2008, evaluation included on-call responsibilities.

[30]Plaintiff failed to establish that defendants treated Henderson more favorably because of
gender since, like plaintiff, defendants evaluated him on the on-call duties.  Moreover, plaintiff
failed also to rebut defendants' contention that Henderson received a higher Performance
Appraisal Score since defendants conducted his evaluation before discovering the issues in the
unit.  Therefore, she failed to establish a *prima facie* case for gender discrimination.

Further, defendants' articulated reasons for plaintiff's scores, *i.e.*, that "[t]he low performance score given to the plaintiff in [April] 2008, was not given for discipline, but was given to the plaintiff based on her poor duty as evidenced by the audit finding that 18 percent of the daycare homes in her caseload had expired licenses," doc. 65 at 5; Doc. 69 at 12-14, overlooks plaintiff's contention that defendants treated Baxley more favorable as it relates to on-call assignments. Significantly, defendants do not dispute that plaintiff's on-call rating contributed to her Performance Appraisal Score and the denial of her annual raise, while Baxley's apparent exemption from on-call responsibilities meant that this task played no role in either her overall rating or annual raise.  Doc. 57-2 at 25.  It may well be that defendants will be able to show that even if they gave Baxley the same on-call rating as plaintiff or even a zero, she still would have scored high enough to receive a raise.  However, that argument, if defendants intend to make it, is for a jury.  For this stage of the litigation,  plaintiff has properly rebutted defendants' articulated reasons.  Accordingly, Jeff Co DHR is not entitled to summary judgment on plaintiff's Title VII race-discrimination claim.[31]  However,

---

[31]As defendants note, plaintiff cannot obtain punitive damages for her Title VII claim against Jeff Co DHR.  *See* 42 U.S.C. § 1981a(b)(1) (no punitive damages against "a government, government agency, or political subdivision").  Moreover, as it relates to the raise, even if she prevails, plaintiff is looking at approximately two months of a salary percentage differential as damages since she resigned effective September 5, 2008.

State DHR's motion for summary judgment on the Title VII claim is granted because plaintiff failed to present *any* evidence indicating that it played a role in Baxley's assignments[32] or in the ratings she and Baxley received.  Likewise, the individual defendants from State DHR – Buckner, Walley, and Jackson – are due summary judgment on the §§ 1981 and 1983 claims for the same reasons.

Finally, as it relates to the §§ 1981 and 1983 race-discrimination claims, the individual defendants from Jeff Co DHR are entitled to qualified immunity because they acted, at least in part, for legitimate non-discriminatory reasons in denying plaintiff's annual raise.  In *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996), the Eleventh Circuit instructed that "[w]here the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity."  94 F.3d at 1534-35.  Therefore, "[a] defendant is entitled to qualified immunity under the *Foy* rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations."  *Stanley v. City of Dalton*, 219 F.3d 1280, 1296 (11th

---

[32]In fact, the evidence is to the contrary since State DHR recommended that Jeff Co DHR deny both employees' request for removal from on-call duties.  Doc. 57-8 at 44, 53.

Cir. 2000).  Here, even viewing the record in the light most favorable to plaintiff,

the record reflects that the Jeff Co DHR individual defendants issued plaintiff

unfavorable ratings and consequently denied her annual raise, in part, for reasons

unrelated to on-call, *i.e.*, her failure to properly inspect and license home daycares.

Indeed, even when the disputed on-call responsibilities are omitted from plaintiff's

evaluation, her Responsibility Score still falls within the Partially Meets Standards

at 14.3, and she testified that "according to the State policy [a Partially Meets

Standards score] does not merit a raise."  Doc. 52-3, Plaintiff's Dep., at 238:16-20.

Moreover, even if her on-call rating is the 2 Mashego hinted plaintiff should

receive when she asked Muscolino whether she "can justify the 1" rating, doc. 60-

1 at 1, plaintiff's Responsibility Score remains within the Partially Meets

Standards range at 15.  Therefore, even when the court omits the disputed "on-

call" aspect of the appraisal, which is the basis for plaintiff's disparate-treatment

claim, the individual defendants were motivated, at least in part, by a lawful basis,

*i.e.*, her failure to properly inspect her daycares, in denying the annual raise.

Likewise, the decision to exempt Baxley from on-call was motivated, at

least in part, by a lawful basis, *i.e.*, concern that she posed a safety threat because

of her bipolar condition and medication.  *See* Doc. 57-1, Muscolino Aff., at 9.

While plaintiff may feel that her ailments were equally severe, the record

presented to this court only supported her contention as of May 22, 2008, when she submitted a note from a treating physician stating that "she's taking medication that is sedative in nature and is unable to work on-call."  Doc. 66-9 at 3.  Significantly, after receiving this note, Muscolino removed plaintiff from the on-call rotation, doc. 57-1 at 10-11, *i.e.*, treated her the same as Baxley.  As such, the individual defendants from Jeff Co DHR are entitled to qualified immunity.

### 2.    *Retaliation*

Plaintiff contends also that defendants retaliated against her in violation of Title VII and §§ 1981 and 1983.[33]  Doc. 36 ¶ 27.  "To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that [s]he engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some causal relation between the two events."  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability."  *Id*.  "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason

---

[33]Plaintiff arguably alleges retaliation under the ADA and FMLA.  Doc. 36 ¶ 27. However, for the reasons stated previously, State DHR and Jeff Co DHR are immune from such claims under the Eleventh Amendment, and no individual liability exists under these statutes.

provided by the employer is a pretext for prohibited retaliatory conduct." *Id.* (citation omitted).

      a.     *Plaintiff establishes a prima facie case.*

Based on the chronology of plaintiff's protected activities and the alleged materially adverse actions, defendants contend that the retaliation claims, at most, consist of the July 7, 2008, charge letter.  Doc. 58 at 38-39.  To reach this conclusion, defendants contend that plaintiff's only protected activities that identified race or sex discrimination are the April 22, 2008, and July 9, 2008, EEOC charges and, therefore, all adverse actions occurring before April 22, 2008, particularly the assignment of on-call duties and "New Worker" training, are immaterial.  Doc. 58 at 33-34.  Plaintiff does not dispute this contention or direct the court to protected activity that referenced race or sex discrimination before April 22, 2008.  Thus, the relevant facts before the court are that plaintiff filed an EEOC charge on April 22, 2008, alleging race and sex discrimination, and that defendants issued her a disciplinary charge letter on July 7, 2008.

These facts are sufficient to establish a causal link, which courts must "construe . . . broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Goldsmith*, 513 F.3d at 1278 (quotation marks and citation omitted).  A plaintiff

satisfies this element if she provides sufficient evidence that her employer had knowledge of the protected expression and "that there was a close temporal proximity between this awareness and the adverse . . . action." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).  Here, even though nearly two and a half months passed between the protected activity and the disciplinary charge letter, defendants actually decided to issue the charge letter sometime in May 2008, doc. 57-2, Mashego Aff., at 6-7, *i.e.*, just a few short weeks after the EEOC charge.

  b. *Plaintiff does not present sufficient evidence of pretext to create a material issue of disputed fact.*

   To prevail on her retaliation claim, plaintiff must establish also that the reasons for the disciplinary charge letter, *i.e.*, her failure to adequately perform her job duties, particularly that 18 percent of the home daycares assigned to her operated with expired licenses, are pretextual.  However, she failed to present any evidence to establish pretext, nor can she do so because Jeff Co DHR issued charge letters to *all* the daycare-licensing unit employees, including the supervisors Turner and Givins.  *See Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (once an employer offers a legitimate reason for the challenged action, the plaintiff "must meet the reason proffered head on and rebut it").  Therefore, summary judgment is granted on the retaliation claims.

## IV.   CONCLUSION

For the foregoing reasons, defendants are entitled to summary judgment on all claims except plaintiff's Title VII race-discrimination claim against Jeff Co DHR.

DONE this 3rd day of June, 2011.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE